1  **LAW OFFICES OF LIN MEYER, INC.**
   **LIN M. MEYER [State Bar No. 188677]**
2  4125 Coldstream Terrace
   Tarzana, California 91356
3  Tel.: 818.758.0251/Fax:  818.776.9982
   lin@linmeyer.com
4
   Attorneys for Plaintiff Anzhey Barantsevich
5

FILED
CLERK, U.S. DISTRICT COURT
MAR - 8 2013
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

6

7

8                   **UNITED STATES DISTRICT COURT**

9                   **CENTRAL DISTRICT OF CALIFORNIA**

10

11  ANZHEY BARANTSEVICH, an           CASE NO.  12 CV 08993 ▓▓▓▓/AJWx
    individual,
12                                     **PLAINTIFF'S NOTICE OF**
                                       **MANUAL FILING OF EXHIBITS**
13          Plaintiff,                 **TO DECLARATION OF LIN M.**
                                       **MEYER IN SUPPORT OF**
14  vs.                                **PLAINTIFF'S OPPOSITION TO**
                                       **VTB BANK'S MOTION TO**
15  VTB BANK, a Russian corporation, VTB   **DISMISS PLAINTIFF'S**
    CAPITAL AM formerly known as VTB   **COMPLAINT**
16  BANK ASSET MANAGEMENT, a
    Russian corporation, VTB CAPITAL, a   Date:      April 1, 2013
17                                     Time:      10:00 a.m.
    New York corporation, and BEAU     Courtroom: 780 [Roybal]
18  CAMERON, an individual,

19
            Defendant(s).
20

21

22  **TO ALL PARTIES:**

23          **PLEASE TAKE NOTICE** that Plaintiff Anzhey Barantsevich has manually

24  filed the Exhibit Nos. 1-25 to the Declaration of Lin M. Meyer in Support of

25  Plaintiff's Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint,

26  copies of which are attached hereto together with said Declaration.

RECEIVED
CLERK, U.S. DISTRICT COURT
MAR - 7 2013
CENTRAL DISTRICT OF CALIFORNIA
BY          DEPUTY

27  ////

28  ////

                                    1

1    This Notice of Electronic Filing of this Notice of Manual Filing is also attached

2   hereto.

3   Dated: March 6, 2013             **LAW OFFICES OF LIN MEYER, INC.**

4

5                           By:_____
                              Lin M. Meyer

6                         Attorney for Plaintiff Anzhey Barantsevich

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MANUAL FILING OF EXHIBITS TO DECLRN OF LIN M.
MEYER IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS

1  **LAW OFFICES OF LIN MEYER, INC.**
   **LIN M. MEYER [State Bar No. 188677]**
2  4125 Coldstream Terrace
   Tarzana, California 91356
3  Tel.: 818.758.0251/Fax: 818.776.9982
   lin@linmeyer.com
4
   Attorneys for Plaintiff Anzhey Barantsevich
5

6

7

8                     **UNITED STATES DISTRICT COURT**

9                     **CENTRAL DISTRICT OF CALIFORNIA**

10

11
   ANZHEY BARANTSEVICH, an          CASE NO.  12 CV 08993 MMM/AJWx
12 individual,
                                    Assigned to:  Judge Margaret M.
13         Plaintiff,               Morrow

14 vs.                              **DECLARATION OF LIN M.
                                    MEYER IN SUPPORT OF
15 VTB BANK, a Russian corporation, VTB   PLAINTIFF'S OPPOSITION TO
                                    DEFENDANT VTB BANK'S
16 CAPITAL AM formerly known as VTB  MOTION TO DISMISS
   BANK ASSET MANAGEMENT, a         PLAINTIFF'S COMPLAINT;
17 Russian corporation, VTB CAPITAL, a   MEMOANDUM OF POINTS AND
                                    AUTHORITIES
18 New York corporation, and BEAU
   CAMERON, an individual,          **Date:**       **April 1, 2013**
19                                  **Time:**       **10:00 a.m.**
                                    **Courtroom:**  **780 [Roybal]**
20         Defendant(s).

21

22                    **DECLARATION OF LIN M. MEYER**

23         I, Lin M. Meyer, declare as follows:

24         1.    I am an attorney at law, duly licensed to practice before this Court and

25 am counsel of record for Plaintiff Anzhey Barantsevich.  I have personal knowledge

26 of the facts attested to in this Declaration and if called upon to testify thereto, I could

27 and would do so.

28         2.    This Declaration is filed in opposition to Defendant VTB Bank's

1    Motion to Dismiss Plaintiff's First Amended Complaint (Document No. 12)

2    ("FAC").

3      3.     Defendant VTB Bank contends in Paragraph 10 of Mr. Yuri Soloviev's

4    Declaration (Document No. 12-1) that VTB Bank had no involvement in the alleged

5    loan purportedly made by VTB Capital AM to Zao Beau Laboratories, or the alleged

6    decisions concerning distribution of the funds associated with the loan and that VTB

7    Bank does no business in the United States or California. These statements are

8    refuted by the following evidence, the Declaration of Anzhey Barantsevich, the

9    Declaration of Mark Rabinovich, and the testimony of Alexandra Johnson and Beau

10   Cameron which is attached to this Declaration.

11      4.     Alexandra Johnson, a California resident affiliated with VTB Bank, was

12   deposed by me in the State of California Superior Court case entitled <u>Anzhey</u>

13   <u>Barantsevich vs. Beau Cameron and Beau Laboratories Los Angeles, Inc.,et al.</u>,

14   LASC No. SC 109621, on or about February 3, 2012. True and correct excerpts

15   from this deposition are attached hereto as Exhibit 1. These excerpts are attached to

16   show that at her deposition Ms. Johnson testified that VTB Bank does business in

17   California, having entered into a Joint Venture here in Menlo, California entitled

18   DFJ VTB Aurora providing venture funds to businesses in the software and

19   technology industries (Deposition pp. 17-21, 22-24); that she participated as a

20   representative of the investment committee of VTB Bank in making the decision to

21   invest in the joint venture of Plaintiff and Beau Cameron which is the subject of the

22   FAC (Deposition pp. 39-40 and 62-66); that she and VTB Bank representatives Sergi

23   Romanov, Uri Soliyov and Sergi Debenev made the decision to enter into the joint

24   venture with Plaintiff (Deposition pp. 39-40); that Oleg Oleynikov, as part of VTB

25   Group's due diligence, evaluated the technology that Beau Cameron presented

26   (Deposition pp. 43-44); that VTB Bank sent a contractor to Los Angeles to evaluate

27   the software (Deposition pp. 51 and 221-222); that VTB Bank accountants

28   questioned Zao Beau Laboratories [the Russia entity set up to carry out the alleged

2

DECLARATION OF LIN M. MEYER IN SUPPOT OF PLAINTIFF'S OPPOSITION TO DEFENDANT VTB
BANK'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

1  joint venture] Board members about expense reports and budgets of the alleged joint
2  venture which depicted the wired funds (Deposition pp. 79 and 101); that Aidar
3  Kaliev of VTB Capital took over resolving the dispute between Beau Cameron and
4  Plaintiff that developed over the Joint Venture (Deposition pp. 118, and 132); and
5  that VTB Bank did an internal investigation of Beau Cameron's and Plaintiff's
6  claims that the other stole monies funded to the alleged joint venture (Deposition pp.
7  159-160; pp. 203-204).

8      5.      Sergey Romanov, identified by Alexandra Johnson as one of the
9  decision makers of VTB Bank making the decision to enter into the alleged joint
10  venture, the subject of Plaintiff's FAC (Document No. 15 filed 01/25/13), appears to
11  be VTB Bank's counsel.  I performed an internet search of Mr. Romanov's name
12  along with "VTB" and pulled up www.akingump.com and Mr. Romanov's profile a
13  true copy of which is attached hereto as Exhibit 2.  According to Mr. Romanov's
14  profile, he represented both VTB Bank and VTB Capital in their acquisition of
15  Mariysky Oil Refinery.

16      6.      Yuri Soloviev, also identified by Alexandra Johnson as one of the
17  decision makers at VTB Bank who approved the decision to enter into the joint
18  venture with Plaintiff, is identified on VTB Bank's website as the First Deputy
19  President and Chairman of VTB Bank's Management Board.  A true and correct
20  printout of Mr. Soloviev's profile is attached hereto as Exhibit 3 and can be accessed
21  on the web at www.vtb.com/group/management/guide/Soloviev.

22      7.      Finally, Sergi Debenev, also identified by Alexandra Johnson as
23  one of the decision makers at VTB Bank who approved the decision to enter into the
24  alleged joint venture is VTB Bank's Chairman of the Supervisory Council.  A true
25  and correct printout of Mr. Debenev's profile is attached hereto as Exhibit 4 and can
26  be accessed on the web at www.vtb.com/group/management/council/dubinin.

27      8.      Mr. Oleg Oleynikov, referenced in the FAC (Document No. 15) is listed
28  on the web as the Chief Investment Manager, Associate Director at VTB Capital.  A

3

1    true and correct copy of his Linked In profile is attached hereto as Exhibit 5.  The

2    profile references at the top of the page that Mr. Oleynikov is associated with Lone

3    Oak Fund LLC –bridge loans $500k to 12.5mm. Properties located in Southern &

4    Northern California.   Lone Oak Fund is located at 11611 San Vicente Boulevard

5    Suite 640, Los Angeles California.

6         9.      Mr. Barantsevich's (Plaintiff) and Mr. Rabinovich's (Zao Laboratories

7    Board Member and counsel for Barantsevich and Cameron) Declarations filed

8    herewith reflect they met at VTB Bank headquarters in Moscow with Yuri Soloviev

9    and other VTB Bank officials to negotiate the alleged joint venture, including the

10   funds that had to be wired.

11        10.     Per the website of VTB Group, Defendants VTB Bank, VTB Capital

12   and VTB Capital Asset Management are all part of "VTB Group" which is governed

13   by a centralized VTB Bank governance board.  The Board manages the subsidiaries

14   by

15              ". . .exercise of the parent bank's [VTB Bank's] rights as principal

16              shareholder by means of participation of its representatives in

17              management bodies of subsidiaries. . ."

18   A true and correct printout of VTB Group's main website is attached hereto as

19   Exhibit 6 and is available on the web at www.vtb.com.  Yuri Soloviev, with whom

20   Plaintiff met, per his declaration, is listed as First Deputy President and Chairman of

21   VTB Bank Management Board. The map included in VTB Group today shows

22   locations throughout Europe and in the United States.

23        11.     VTB Bank files a consolidated Financial Statement and Auditor's

24   Report published publically and prepared by Ernst & Young.   A true and correct

25   copy of the Consolidated Financial Statements and Auditor's report for 31 December

26   2011 and 2010 is attached hereto as Exhibit 7.  At page 7, the Notes to this report

27   reflect that VTB Bank and its subsidiaries constitute "VTB Group" and at page 12

28   the Notes state:

1                 "Subsidiaries are those entities, in which the Group has direct or indirect

2                 interest of more than one half of the voting rights, or otherwise has

3                 power to govern the financial and operating policies so as to obtain

4                 benefits from its activities."

5       12.     Defendant Beau Cameron throughout his testimony at Arbitration in

6 California's Alternative Resolution Center, Case No. 78M292 continually identified

7 VTB Bank as the entity with whom he was aware that all terms of the alleged Joint

8 Venture were negotiated and approved. True and correct excerpts from the

9 Arbitration transcribed proceedings on November 2, 2011, pp.1062-1063, 1090-

10 1092, 1104-1105, 1186-1168 are attached hereto as Exhibit 8. True and correct

11 excerpts of the Arbitration transcribed proceedings on October 18, 2011 at pp. 323,

12 392-398 are attached as Exhibit 9.

13       13.     The deposition of Defendant Beau Cameron, a California resident, was

14 also taken in the Arbitration Resolution Centers Case No. 78M2972. True and

15 correct excerpts of his testimony are attached hereto as Exhibit 10, (September 27,

16 2011 Deposition pp. 779, 783-785, 787), Exhibit 11 (September 14, 2011 Deposition

17 pp. 535-536, 572-573, 586-587, 638-639, 641, 676), Exhibit 12 (August 25, 2011

18 Deposition pp. 38-40, 68-69, 192, 229-231, 259, 312-314), and Exhibit 13

19 (September 13, 2011 Deposition pp. 329, 343, 351, 372-373, 376 377, 398, 401, 445,

20 451, 454-456, 480,-481). The foregoing testimony is attached to show that again

21 Defendant Beau Cameron also believes the entity contracting with Plaintiff and

22 himself to develop the software was VTB Bank.

23       14.     Aidar Kaliev, also specifically mentioned in the FAC (Document No.

24 15) as one of the acting representatives of VTB Bank, is evidently representing VTB

25 Bank's interest with respect to its California Joint Venture DFJ Aurora VTB Capital

26 Aurora at website www.dfjaurora.com. As previously referenced, Ms. Alexandra

27 Johnson testified that VTB Bank is partnered with DFJ, a California funding

28 company. On the DFJ VTB Capital Aurora website for this partnership "Our Team"

1  includes Aidar Kaliev, listed as Managing Director, Global Head of Venture Capital,

2  VTB Capital and Alexandra Johnson, Managing Director, DFJ VTB Capital Aurora.

3  The posted address for DFJ VTB Capital Aurora is Menlo Park, California. A true

4  and correct printout from this website is attached hereto as Exhibit 14.

5      15.    Aidar Kaliev is also depicted as a member of the team at VTB Capital

6  Investment Management at www.vtbcapital-im/our_team. A true and correct copy of

7  a printout from this website is attached as Exhibit 15. At VTB Capital's website at

8  www.vtbcapital.com, Aidar Kaliev is listed as a representative of VTB Capital. A

9  printout from this website is attached hereto as Exhibit 16.

10     16.    Attached hereto as Exhibit 17 is a true and correct printout of VTB

11  Group's 2011 Annual report. At page 322 of the Exhibit, VTB Group indicates that

12  VTB Capital Asset Management "operates in the USA, Europe and Countries of the

13  Asia-Pacific region" and has operated since the year 2007.

14     17.    Per Plaintiff Anzhey Barantsevich's Declaration, he and his then lawyer

15  David Wheeler, requested a meeting with VTB Bank and met with VTB Bank

16  representatives in California in early 2010 to discuss that Plaintiff was falsely

17  accused by Defendant Beau Cameron of converting the $1,050,000 in funds he wired

18  to Vestax and Bigland per VTB Bank instructions. The VTB Bank representative in

19  attendance was Victor Belogub. Mr. Belogub, per an article pulled off the web, is

20  the Chief Investment Manager at VTB Capital. A true and correct printout from the

21  web of this article is attached hereto as Exhibit 18.

22     18.    Attached hereto as Exhibit 19 is a true and correct copy of a printout

23  from the website address www.vtb.com/ir/disclosure/structure which depicts the

24  Shareholder Structure of VTB Bank as 16.0864% GDRs issued through Bank of

25  New York International Nominees.

26     19.    In or about late 2011 or early 2012, I was contacted by a Mr. Gary

27  Amato, a Colorado attorney, who told me that he was hired by VTB Bank to

28  represent Zao Beau Laboratories interests in the outcome of the litigation pending in

1  the California Superior Court LASC Case Nos. SC 107179 and SC 109621 between

2  Beau Cameron, Beau Laboratories Los Angeles, Inc. and Plaintiff Anzhey

3  Barantsevich.  Even though his client was not a party to the lawsuits, Mr. Amato

4  was very desirous of settling the lawsuits. He said he could even control Beau

5  Cameron and his attorneys, and on several occasions offered a walk-away and

6  mutual release of all parties and the judgment Beau Cameron obtained in the

7  Arbitration Proceeding between Plaintiff and his private company Beau LLC.  True

8  and correct copies of Mr. Amato's most recent emails made on behalf of Zao Beau

9  Laboratories and/or VTB Bank are collectively attached hereto as Exhibit 20 and are

10 offered only to prove Mr. Amato was acting on VTB Bank and Zao's behalf here in

11 the United States.  When Plaintiff refused these offers, Mr. Amato told me that there

12 is no way your client can ever collect any money in these cases because Beau

13 Laboratories has no assets or monies, and Beau Cameron is judgment proof.  He

14 adamantly told me, your client "cannot pursue VTB Bank in Russia because if he

15 comes there, under Russian Law he will be immediately arrested and imprisoned."

16      20.      Apart from the imminent threat of arrest Plaintiff faces, Russia is not a

17 viable forum for trial of this case because the integral parties and witnesses reside

18 here in California:

19           A. Defendant Beau Cameron resides in Culver City, California, see

20 proof of service attached as Exhibit 21;

21           B. Plaintiff Anzhey Barantsevich resides in Encino, California;

22           C. Mark Rabinovich, Zao Beau Laboratories Board Member resides in

23 the County of Los Angeles, State of California;

24           D. Alexandra Johnson, a VTB Bank representative and Zao Beau

25 Laboratories Board Member resides in California; and

26           E. Beau Laboratories Los Angeles, Inc. (and its current and past

27 employees) is located in Culver City, California;

28           F. Beau Cameron Inc., the entity formed to own Barantsevich's and

1    Cameron's interest in Zao Beau Laboratories, is located in Venice California;

2         G. Messrob Torikian [he created a falsified software evaluation VTB

3    used to defraud investors] resides in Los Angeles, California;

4         H. Bank of America, Los Angeles—the entity Beau Laboratories Los

5    Angeles, Inc. banked with was convinced to turn over Beau Laboratories funds to

6    Beau Cameron and VTB overlooked this.

7      21.    The acts complained of in the FAC (Document No. 15) occurred here in

8    Los Angeles as Plaintiff alleges he received the wiring instructions in Los Angeles

9    and gave the wiring instructions to Mark Rabinovich in Los Angeles, who wired the

10    funds from a Los Angeles Bank. Beau Laboratories Los Angeles, Inc. received all

11    the funding from VTB Bank and claims the wired funds were stolen from it here in

12    Los Angeles. FAC ¶¶ 18-23. The litigation VTB allegedly funded against Plaintiff

13    to force him to take the blame for kickbacks VTB Bank and Cameron received, and

14    the alleged money laundering occurred here in Los Angeles, California. VTB

15    negotiated with Plaintiff and Cameron in San Jose, California and came to inspect

16    the Software in Venice, California and hired a local contractor here to do the work.

17      22.    Moreover, VTB Bank has sufficient minimum contacts with this forum

18    state as to make it just to try this action here as:

19         A. VTB Bank required as part of the Joint Venture Agreement that the

20    parties form and operate Beau Laboratories Los Angeles, Inc. in California to

21    develop the software for the Joint Venture. Beau Laboratories Los Angeles, Inc. is a

22    wholly owned subsidiary of Zao Beau Laboratories (a shell company formed to own

23    Beau Laboratories LA which is owned by VTB Bank and Beau Cameron Inc.);

24         B. VTB Bank entered into a partnership in California to provide

25    funding for technology companies like Beau Laboratories Los Angeles, Inc., i.e.,

26    DFJ VTB Aurora;

27         C. VTB reports on its website it operates globally throughout Europe

28    and the United States;

D. Per Alexandra Johnson's testimony, VTB Bank employed her here in California on a contract basis;

E. Per Alexandra Johnson's testimony, VTB sent and employed contractors to Los Angeles to investigate the software Beau Laboratories LA was developing here;

F. VTB Bank set up VTB Capital's offices in the United States, in the State of New York.

23. On or about October 23, 2012, Plaintiff attempted to serve VTB Bank two ways:

A. A copy of the Summons and Complaint was mailed by Registered Mail return receipt requested to the following addresses:

1) VTB Bank at 43 Ul. Vorontsovskaya, Moscow, Russia 109044

2) VTB Asset Management at 452 Fifth Avenue, 23rd Floor, New York, NY 10018.

B. A courtesy copy of the Summons and Complaint was served on Gary Amato who identified to me he was hired by VTB Bank to represent Zao Beau Laboratories.

24. Plaintiff could not serve VTB Bank via the Hague Convention as Russia has refused to accept service of United States originating complaints due to a long term dispute. See attached copy of Affidavit of John Pierceall attached hereto as Exhibit 22, the original of which will be filed with Plaintiff's Ex Parte Motion for Appointment of Special Process Server in the event the Rule 4d waivers are not signed.

25. Since then, Maria Melendez, counsel for all the VTB entity defendants has advised that VTB Asset Management and VTB Capital will accept service pursuant to Rule 4d waivers. A true and correct copy of counsel's email is attached hereto as Exhibit 23.

26.     At the Case Management Conference on February 25, 2013, Ms. Melendez represented that VTB Bank had not yet confirmed they will accept service pursuant to the Rule 4(d) waiver but she expected that VTB Bank would likewise agree to accept service via a Rule 4d waiver.

27.     Attached hereto as Exhibit 24 is a true and correct copy of a printout of the LinkedIn page for VTB Capital, at www.linkedin.com/company/vtb-capital which describes, on page 3 thereof under "About VTB Capital" the business of VTB Capital and states that is operates in various locations, including New York.

28.     Attached hereto as Exhibit 25 is a true and correct copy of excerpts of the deposition testimony of Mark Rabinovich taken on February 1, 2011 by opposing counsel representing Beau Laboratories Los Angeles, Inc. in the Los Angeles Superior Court Case No. SC 109621, which are attached to show that VTB Bank directly participated in the scheme to cause Plaintiff to wire illegal kickback monies to Russia.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the _6th_ day of March, 2013, at Tarzana, California.

LIN M. MEYER

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   COUNTY OF LOS ANGELES

3

4    ANZHEY BARANTSEVICH, an          )
     individual,                      )
5                                     )
                      Plaintiff,      )
6                                     )
          vs.                         ) No. SC 109621
7                                     )
     BEAU CAMERON, an individual;     )
8    BEAU LABORATORIES LOS ANGELES,)
     INC., a California               )
9    corporation; and DOES 1          )
     through 50, inclusive,           )
10                                    )
                      Defendants.     )
11   _____)
                                      )
12   AND RELATED CROSS-ACTION.        )
     _____)

13

14

15

16

17          Deposition of ALEXANDRA JOHNSON, taken on

18   behalf of the Plaintiff and Cross-Defendant, at 2225,

19   East Bayshore Road, Suite 200, Palo Alto, California,

20   commencing at 10:24 a.m., Friday, February 3, 2012,

21   before Jane H. Stuller, CSR No. 7223, RPR.

22

23

24

25

                          2

ALEXANDRA JOHNSON    EXHIBIT 1
                        11

BARKLEY
Court Reporters

1  company; is that correct?

2      A.  Should I explain how a venture fund works?

3  It's -- the management -- a management company with

4  management fees, and then there's an upside upon the

5  return of the investments.  And then when that happens,

6  then managing directors get stock in the companies they

7  sit on boards of.

8      Q.  Okay.  So in sitting on the board of ZAO Beau

9  Laboratories at some point, if there was a return on

10  that investment, you would get stock in that company; is

11  that correct?

12      A.  That was the understanding at the time.

13      Q.  Have you done work with VTB Bank in the past

14  before this venture with-- that became ZAO Beau

15  Laboratories?

16      A.  The DFJ formed a partnership VTB, so I started

17  working with VTB in that capacity in 2006.

18      Q.  Did VTB Bank own an interest in DFJ?

19      A.  No.

20      MR. FIGUEIREDO:  Objection to the extent it

21  calls for speculation.

22  BY MS. MEYER:

23      Q.  Now, what -- you said they formed a

24  partnership?

25      A.  Yeah.  They're two separate entities.  They are

17

1  not related. They formed the joint venture, so they are
2  -- there's two separate entities.
3      Q.  What's the point of their joint venture?
4          MR. FIGUEIREDO:  Objection; calls for
5  speculation.
6          THE WITNESS:  To create -- to create the Russia
7  fund.
8  BY MS. MEYER:
9      Q.  Okay.  Do you know -- are you -- since your
10 counsel is making these objections, do you know what the
11 purpose of the joint venture is?  Are you in a position
12 to know that?
13     A.  Yes.
14     Q.  And you said it's to create Russian funds.  Can
15 you be more specific than that?
16     A.  VTB wanted to have a venture fund.  DFJ is a
17 venture fund working globally.  VTB was seeking DFJ's
18 experience in running a fund.  VTB is an investor in
19 that fund.
20     Q.  Okay.  Is DFJ also an investor in that fund?
21     A.  DFJ is a part of a joint venture and a part of
22 the management team.
23     Q.  So DFJ owns its part of that joint venture
24 through another joint venture.  Is that what you're
25 saying?

18

ALEXANDRA JOHNSON  EXHIBIT 1
13

BARKLEY
Court Reporters

1    A.   I would rather not talk about it because it's a
2    different company.  DFJ has nothing to do with this
3    case, and I'm not really in a position to know what
4    their interest is in there financially.
5         Q.   Is there some reason why you don't want to
6    disclose the name of that company?
7         A.   Which company?
8              MR. RAPKIN:  Objection; irrelevant.
9              MS. MEYER:  What I'm trying to find out is, is
10   VTB -- the VTB joint venture that -- you said that
11   there's a joint venture through which you -- you are
12   partic -- your company is a part of a joint venture that
13   participates with VTB, and I'm just trying to find out
14   the name of that joint venture.
15        A.   The ZAO Beau Labs is not a part of this
16   venture, and it has nothing to do with that joint
17   venture.
18        Q.   I understand ZAO Beau Laboratories had nothing
19   to do with the joint venture.  But if I understood your
20   testimony before, you said that VTB Bank and DFJ formed
21   a partnership where they were going to create a Russian
22   fund.  And then I asked you if you -- and you said VTB
23   was an investor in that joint venture.  And I asked if
24   DFJ was an investor in that -- that joint venture as
25   well, and you said it was through another joint venture.

19

BARKLEY
Court Reporters

1   So I'm trying to find out the name of the company that's

2   partnered with VTB Bank.

3      A.   The joint venture was formed in January of this

4   year, so it's really not relevant to our discussion

5   about Beau or ZAO Labs.

6      Q.   Well, I understand that you don't think it's

7   relevant, but could you please answer my question.

8      MR. FIGUEIREDO:  No.  I think the witness has

9   answered to the extent that I can see any relevance to

10   the case.  I'm going to instruct the witness not to

11   answer on the grounds that it's proprietary,

12   confidential, trade secret information of a venture

13   having absolutely no relationship to this case

14   whatsoever.

15      MS. MEYER:  The name of the joint venture is

16   trade secret information?  Is that what you're telling

17   me?

18      MR. FIGUEIREDO:  I'm going to instruct the

19   witness not to answer, yes.

20      MS. MEYER:  Well, I'm going to just state,

21   Counsel, that I think that's inappropriate because the

22   relationship with VTB Bank could well impact this case

23   because VTB Bank is -- my understanding is funding your

24   offices today to appear for -- on behalf of Sasha

25   Johnson or Alexandra Johnson.

20

ALEXANDRA JOHNSON   EXHIBIT 1

15

BARKLEY
Court Reporters

1      And if VTB is involved in doing that, I think

2  that I'm entitled to know what the relationship between

3  Ms. Johnson's company is and VTB Bank.

4      THE WITNESS: Oh, that is different.  So

5  Ms. Johnson has a relationship with VTB capital.  We

6  have a consulting agreement.  And I'm operating and

7  working with VTB based on that consulting agreement

8  between me as an individual and them as a bank.

9  BY MS. MEYER:

10     Q.  Okay.  But you have a consulting agreement

11  that's separate and apart from the fact that your

12  company itself has a relationship with VTB Bank; is that

13  correct?

14     A.  Yes.

15     Q.  Okay.  And is there something secret about the

16  name of the company participating in that joint venture

17  with VTB Bank that you feel it would be improper to --

18     A.  It's not secret.  It's just not relevant.

19     MR. RAPKIN:  Objection; irrelevant, and let's

20  move on.

21     MS. MEYER:  I think it goes to the issue of

22  bias, and I think I'm entitled to know the name of the

23  company.

24     MR. RAPKIN:  She's told you she's not going to

25  answer the question.

21

ALEXANDRA JOHNSON   EXHIBIT 1
16

BARKLEY
Court Reporters

1       THE WITNESS:  Well, Lin, it's on the website.

2  It's public information.  You know you're welcome to

3  look it up.

4  BY MS. MEYER:

5       Q.  Well, I'm also asking you the question.  If

6  it's public information, you shouldn't have a problem

7  telling me.

8       A.  Well, I'm acting on the advice of my attorney.

9       MR. FIGUEIREDO:  Why don't you just tell her

10  what the website is.  Describe the website, and let's

11  move on.

12       THE WITNESS:  Okay.  It's DFJ-VTB Aurora.

13  BY MS. MEYER:

14       Q.  A-U-R-O-R-A?

15       A.  A-U-R-O-R-A.

16       Q.  Okay.  And how did you -- how were you

17  introduced to VTB Bank?

18       A.  I knew them from my previous work.

19       Q.  And where were you working when you met them?

20       A.  I came to Moscow to explore Russian

21  opportunities for DFJ.

22       Q.  I'm sorry.  I couldn't hear you -- I couldn't

23  hear your answer.

24       A.  I came to Moscow to explore Russian

25  opportunities for DFJ, and that's when I met VTB.

ALEXANDRA JOHNSON      *EXHIBIT 1*
17



1     Q.   And who did you meet at VTB when you came

2   there?

3     A.   They are not associated with the bank anymore.

4   I can give you the names, but they are not there, Andrei

5   Zuzin -- Z-U-Z-I-N.

6     Q.   Okay.  Andrei Zuzin was your -- was your

7   contact at VTB Bank?

8           MR. FIGUEIREDO:  Objection; vague as to time.

9           THE WITNESS:  I know a lot of people at VTB

10  Bank, so I -- I don't know what exactly the question is.

11  BY MS. MEYER:

12    Q.   Okay.  Well, let's go to your VTB consulting

13  agreement.  What do you do for VTB under that consulting

14  agreement?

15    A.   I help them evaluate technologies.  And once in

16  a while I sit on the board of the portfolio companies

17  they form.

18    Q.   So all of the companies that VTB forms, are

19  they all in partnership with the Russian government?

20          MR. FIGUEIREDO:  Objection -- objection; calls

21  for speculation.  Objection to the extent this is

22  proprietary and trade secret information involved in

23  ventures having nothing to do with ZAO Beau Labs.

24  Ms. Johnson can certainly answer with respect to ZAO

25  Beau Labs.  But beyond that, at least at the present,

23

1 I'm going to instruct her to restrict her answer to ZAO
2 Beau Labs.

3         THE WITNESS:  VTB is a private bank, and it has
4 a venture department.  And it makes investments based on
5 the -- on the list of requirements which a company needs
6 to meet.  And it's a private bank that makes decisions
7 by the managing directors of that venture department.
8 BY MS. MEYER:

9     Q.  Well, isn't it true they also got grants from
10 the Russian government?

11     A.  I don't know what the bank does with the
12 Russian government.

13     Q.  Okay.  Well, you do know in the case of ZAO
14 Beau Laboratories; do you not?

15     A.  ZAO Beau Labs is one of the companies where VTB
16 invested.  I don't know where VTB get its funds.

17     Q.  You're boyfriend, Mr. -- I'm going to spell his
18 name -- A-Z-A-M-I-R-Z-Y-A-N, what is his relationship
19 with VTB bank?

20     A.  What?

21         MR. FIGUEIREDO:  Objection.  What is the --
22 objection to the characterization of "boyfriend."
23 Assumes facts not in evidence.  Ms. Meyer, if you want
24 to ask questions about the case, you're welcome to.  If
25 you want to ask personal questions, we're going to

24

1      Q.   Okay.  And you only know about it publicly, you

2  don't know the gentleman personally; is this correct?

3      A.   What is your question?

4      Q.   My question is, do you know this gentleman?

5      A.   I do know this gentleman.

6      Q.   Okay.  And he is head of the Russian venture

7  capital company.  What does the Russian venture capital

8  company do?

9           MR. RAPKIN:  Objection; irrelevant.

10          MR. FIGUEIREDO:  Objection; calls for

11  speculation.

12          THE WITNESS:  Well, the Russian venture company

13  is also publicly known information.  They are an

14  institute for development which supports

15  entrepreneurship and innovation in Russia.

16  BY MS. MEYER:

17     Q.   Okay.  And aren't they a government-funded

18  organization?

19     A.   That's correct.

20     Q.   And they're a government organization that

21  oversees and gives Russian money out to various

22  industries and, in fact, would be the entity that would

23  oversee giving money to VTB Bank for formation of ZAO

24  Beau Laboratories; is that correct?

25          MR. RUBENSTEIN:  Object on the basis that the

27

BARKLEY
Court Reporters

1  question is vague and compound.

2          MR. FIGUEIREDO:  Object; vague and calls for

3  speculation.

4          MS. MEYER:  You can answer the question.

5          THE WITNESS:  Part of the activities as a fund

6  to fund -- to invest in other venture funds.

7  BY MS. MEYER:

8      Q.  And are they not the company that oversaw the

9  investment in VTB Bank?

10     A.  They were an investor in the fund of -- formed

11 with VTB.

12     Q.  Okay.  Is that company a referral source for

13 your business as well?

14     A.  No.

15     Q.  I'm going to ask you what documents -- to

16 describe the documents that you brought with you today.

17         MR. FIGUEIREDO:  Ms. Meyer, I'm trying -- I'll

18 describe them.  There's Johnson000001 through Johnson

19 000396.  There's 396 pages of Bates numbered documents

20 in a stack that I have on the desk right here.

21         MS. MEYER:  Okay.  If you don't want to -- I

22 thought I could make it easy for you and have you give

23 me a general description; but I'll just go through the

24 notice, and we'll see what you've produced.

25         MR. FIGUEIREDO:  If you want a general

28

ALEXANDRA JOHNSON   EXHIBIT 1
21

BARKLEY
Court Reporters

1  don't know.

2  BY MS. MEYER:

3      Q.  You don't know if you applied for a job?

4      A.  I don't know who -- what the process was.

5      Q.  Well, you were denied a job by VTB Bank,

6  correct?

7      A.  I'm not sure about the statement.

8          MR. FIGUEIREDO:  Objection; vague.

9  BY MS. MEYER:

10     Q.  Isn't it true that you sought a job with VTB

11  Bank and they denied you the job?

12     A.  I was not seeking a job.

13     Q.  Well, you said you don't know what the process

14  was.  So did you come to somehow be up for a job at VTB

15  Bank?

16     A.  VTB approached me asking me to do it, and we

17  agreed that a consulting agreement is better.

18     Q.  And is that because of security concern with

19  respect --

20     A.  I'm not aware of that.

21     Q.  Have you ever been convicted of a felony?

22          MR. FIGUEIREDO:  Hold on.  Ms. Meyer, I'm just

23  asking Ms. Johnson to wait until you're done with your

24  questions before she responds so that the court reporter

25  can record each person one at a time.

38

1    Please, proceed.

2  BY MS. MEYER:

3    Q.  Have you ever been convicted of a felony,

4  Ms. Johnson?

5    A.  No.  Oh, I'm sorry.

6    Q.  Yes is your answer?

7    A.  No.

8    Q.  No.  Okay.

9    MR. FIGUEIREDO:  Again, I was motioning for

10 Ms. Johnson to wait until you were done with your

11 question before she answers.

12 BY MS. MEYER:

13   Q.  Okay.  Did you participate in -- with the

14 investment committee of VTB Bank in making the decision

15 to invest in the software development project that Beau

16 Cameron and Anzhey Barantsevich were presenting?

17   A.  Yes.

18   Q.  And what was your participation?

19   A.  I was participating in the meetings of the

20 investment committee.

21   Q.  And who was on that investment committee?

22   A.  You want to know the members of the investment

23 committee?

24   Q.  Correct.

25   A.  Which year?  There were different -- different

39

ALEXANDRA JOHNSON   *EXHIBIT 1*
23

**BARKLEY**
Court Reporters

1   years.

2       Q.  Well, why don't we start with 2008.

3       A.  2008 that would be Sergi Romanov, Uri Soliyov,

4   and I -- myself, and Sergi Debenev.

5       Q.  Was Andrei Zuzin on that committee?

6       A.  Andrei Zuzin was present at the meetings.  I

7   don't believe he was a member of the committee.

8       Q.  What was Andrei Zuzin's position at the time?

9       A.  He was employed by the VTB venture department.

10      Q.  And what was his title?

11      A.  He was a director.

12      Q.  And was he the person in charge of presenting

13  this investment opportunity?

14      A.  Yes, he was.

15      Q.  Did he have any role in the approval of the

16  investment?

17          MR. FIGUEIREDO:  Calls for speculation.

18          To the extent you know, you can answer.

19          THE WITNESS:  He was present at the meetings.

20  And -- yeah, all -- he was aware of the company,

21  obviously.

22  BY MS. MEYER:

23      Q.  But you don't know whether or not he had a role

24  in the approval of the investment; is that correct?

25      A.  Investment could be approved by the committee,

40



1  was acceptable to her.

2          MS. MEYER:  Okay.

3          THE WITNESS:  Yeah.

4          MR. FIGUEIREDO:  Is there anything else?

5          THE WITNESS:  Well, those will be the top ones,

6  yeah.

7  BY MS. MEYER:

8      Q.  Okay.  Now, you said it was original

9  technology.  How did you know that?

10     A.  A part of the due diligence progress a fund

11  has, usually there are -- are team members who evaluate

12  various aspects of the technology, and that was done for

13  this deal as well.

14     Q.  And who were the team members who evaluated

15  aspects of the technology?

16     A.  There were members of the VTB venture

17  department and various other departments of VTB.  It's a

18  teamwork.  There are a lot of people there.

19     Q.  Do you know who they are?

20     A.  Not all of them.

21     Q.  Do you know who some of them were that worked

22  on this particular evaluation?

23     A.  Are you asking me for a specific name of a

24  person?

25     Q.  Correct.

43

BARKLEY
Court Reporters

1      A.   If I were to name the most active one,

2   Oleynikov -- O-L-E-Y-N-I-K-O-V.

3      Q.   Okay.  And Oleynikov, what was his

4   technological background?

5           MR. RAPKIN:  Objection; calls for speculation.

6           MR. FIGUEIREDO:  Objection; calls for

7   speculation.

8           You can answer to the extent you know.

9           THE WITNESS:  He has an engineering background

10   and he graduated from -- from what I remember, one of

11   the top Russian universities -- technical universities.

12   I don't know which one.

13   BY MS. MEYER:

14      Q.   Okay.  And he was the one who evaluated the

15   software technology?

16           MR. RUBENSTEIN:  Objection; misstates her --

17           MR. FIGUEIREDO:  Mr. Rubenstein, just an

18   observation, you're coming in softest out of everybody.

19           MR. RUBENSTEIN:  Just the furthest away.

20   That's probably the problem.

21           MS. MEYER:  If you want to move your chair, you

22   can.  But he has a very soft voice in general.

23           I'm sorry.  I didn't hear an answer.

24           THE WITNESS:  Oleynikov was lead person of the

25   team.  And however he got involved, there were other

44

ALEXANDRA JOHNSON   EXHIBIT 1
26

BARKLEY
Court Reporters

1          MR. FIGUEIREDO:  Same objections.  It's a hypo

2   -- calls for speculation.  It's a hypothetical -- it's

3   an incomplete hypothetical.

4          MS. MEYER:  You can answer the question.

5          THE WITNESS:  A project like that would never

6   have made it to the investment committee.  That usually

7   is done before -- during the due diligence process.

8   BY MS. MEYER:

9      Q.  Okay.  During the due diligence process, are

10  you aware of anyone traveling to the United States and

11  actually using the software?

12         MR. RAPKIN:  Objection, irrelevant.

13         THE WITNESS:  Traveling or using the software?

14         MR. FIGUEIREDO:  Objection; vague.

15         THE WITNESS:  Who would be --

16  BY MS. MEYER:

17     Q.  Are you aware of anybody at VTB Bank actually

18  going to the United States and operating the software?

19     A.  What do you mean by "operating the software"?

20     Q.  Well, what I mean by it is sitting on a

21  computer and actually trying to operate what the

22  software was and what it was designed to do.

23         MR. FIGUEIREDO:  Objection; calls for

24  speculation as to the activities of others.

25         The witness can answer to the extent she has

                          51

1    personal knowledge.

2            THE WITNESS:  The demo was done by the company

3    as a part of a presentation.

4    BY MS. MEYER:

5        Q.  Do you know if it was done before or after the

6    investment?

7        A.  If I were to speculate --

8            MR. FIGUEIREDO:  Don't -- don't guess.

9            THE WITNESS:  No?  Okay.

10           MR. FIGUEIREDO:  Don't guess.

11           THE WITNESS:  I don't know.

12   BY MS. MEYER:

13       Q.  You don't know?

14       A.  No.

15       Q.  Do you know that anything other than the

16   technical report was provided to VTB before the

17   investment was made?

18       A.  There was a set of documents -- a standard set

19   of documents, whatever it has in it.

20       Q.  And you don't know what that standard set of

21   documents is, correct?

22       A.  It's attached to one of those e-mail.

23       Q.  So what -- if I recall your testimony, you said

24   that there would have been a business plan most likely.

25   There was a technical report.  Was there anything else

                            52

ALEXANDRA JOHNSON  EXHIBIT 1
                              28


BARKLEY
Court Reporters

1    Q.  Did it include more -- the technical report

2    that was attached to the investment memorandum?

3    A.  It was part of the business plan, and the

4    business plan has a lot of chapters in it.

5    Q.  Okay.  And the business plan.  Anything else?

6    MR. FIGUEIREDO:  Other than what's been talked

7    about for the last 20 minutes?

8    MS. MEYER:  I think my question is really

9    clear.  I'm asking about the contract now.  That is the

10   -- as I understand it, that's the investment memorandum.

11   MR. FIGUEIREDO:  Objection; vague as to

12   contract.  I've not heard the word "contract" in one of

13   your questions before.

14   BY MS. MEYER:

15   Q.  Ms. Johnson, is there any contract between VTB

16   and the developers of this project, Beau Cameron and

17   Anzhey Barantsevich, other than the investment

18   memorandum?

19   MR. FIGUEIREDO:  Objection; misstates that the

20   investment memorandum is a contract.  Assumes facts not

21   in evidence.

22   MS. MEYER:  And speaking objection; I really

23   don't need that.

24   Q.  Is there a contract that you're aware of

25   between VTB Bank and the developers of this software?

61

ALEXANDRA JOHNSON   EXHIBIT 1
29

BARKLEY
Court Reporters

1        A.   Between VTB Bank?

2        Q.   Is there a contract?  Did VTB Bank invest with

3   no contract?

4        A.   VTB Bank is a huge entity.

5        Q.   I'm not asking you that.  I'm asking you what

6   is the contract reflecting this deal -- this investment

7   deal?

8        A.   I -- I don't understand.  What contract?

9        Q.   You don't know what a contract is?

10            MR. FIGUEIREDO:  Ms. Meyer, please ask your

11   next question.

12   BY MS. MEYER:

13        Q.   My question is, do you know what a contract is,

14   Ms. Johnson?

15        A.   As a legal form?

16        Q.   Do you know what an agreement is?

17        A.   Yeah, it's a legal form.  You're asking me do I

18   know the legal form title contract to an agreement?

19        Q.   Or what one is?

20        A.   As a legal form, yes.

21        Q.   How does VTB reflect in writing what terms it's

22   going to invest in a deal on?  Is it in a contract?

23        A.   No.  There will be an investment decision made

24   within the investment committee.

25        Q.   And how it's documented?

62

ALEXANDRA JOHNSON   EXHIBIT 1
30

BARKLEY
Court Reporters

1     A.   That will be in the minutes of the investment
2   committee decision.
3     Q.   And how is the agreement formalized with the
4   other party?
5     A.   Well, that I would not know.
6     Q.   But you don't know what an investment
7   memorandum is?
8     A.   Ms. Meyer, there's a legal department which
9   handles all that at VTB, and I cannot give you the name
10  of the official contract they ended up with.
11    Q.   You don't know if they had a contract -- a
12  written contract; is that correct?
13    A.   Contract about what?
14    Q.   My understanding of your testimony is that VTB,
15  the investment committee, made the decision to invest in
16  ZAO Beau Laboratories, correct?
17    A.   They made a decision to make an investment,
18  yes.
19    Q.   And then I asked you how they formalized the
20  agreement to invest.  And you said you don't know; is
21  that correct?
22    A.   Yes.
23    Q.   But you don't know what the investment
24  memorandum is; is that correct?
25         MR. FIGUEIREDO:  Objection; misstates

ALEXANDRA JOHNSON   EXHIBIT 1
31

BARKLEY
Court Reporters

1  testimony.  The investment memorandum is a separate

2  topic that we've talked about ad nauseam, asked and

3  answered.  Ask the question next.

4         MS. MEYER:  I want an answer to this question.

5  I don't believe it was asked and answered.

6         MR. FIGUEIREDO:  What is the question?  Whether

7  she know what an investment memorandum is?

8  BY MS. MEYER:

9     Q.  What the investment memorandum in this case is?

10        MR. FIGUEIREDO:  She's already testified that

11  she reviewed it.

12  BY MS. MEYER:

13    Q.  Do you know what it is?

14        MR. FIGUEIREDO:  Objection; vague.  I don't

15  even know what you're asking.

16  BY MS. MEYER:

17    Q.  Do you understand that document to be the

18  contract between VTB Bank and the entities that were

19  representing or were the product of Beau Cameron and

20  Anzhey Barantsevich?

21    A.  What is the entity of Beau Cameron and Anzhey

22  Barantsevich?  I am a member of the board of the ZAO

23  Beau Lab Russia.  What entity are your referring to?

24    Q.  I'm referring to Beau Cameron, Inc.

25        MR. RUBENSTEIN:  Objection.  This is a lawsuit

ALEXANDRA JOHNSON  EXHIBIT 1
32

BARKLEY
Court Reporters

1  involving Beau Laboratories Los Angeles.

2          MS. MEYER: You're just being obstreperous at

3  this point. You have no --

4          MR. RUBENSTEIN: I have --

5          MS. MEYER: You know exactly why I'm asking

6  these questions and you have no motivations here other

7  than to obstruct the deposition. If it's irrelevant and

8  not pertaining to anything in particular, why are you so

9  -- making speaking objections and tying up the record

10  for 15 minutes at a time? That's ridiculous.

11          Could you please answer my question.

12          MR. FIGUEIREDO: Ms. Meyer, are you admitting

13  this is irrelevant and has nothing to do with the

14  lawsuit?

15          MS. MEYER: No, I am not, Counsel. It's very

16  relevant and that's exactly why my opposing counsel is

17  making so many objections and trying to stop the

18  deposition from proceeding in a fashion that could be

19  expeditious.

20          MR. RAPKIN: Of course, I have a right to make

21  objections on the record, and the simple objection is

22  irrelevance.

23  BY MS. MEYER:

24      Q. Okay. So, Ms. Johnson, clear this up for me.

25  You don't know in this case whether or not the

65

BARKLEY
Court Reporters

1  investment memorandum purports to be the contract

2  between VTB Bank and Beau Cameron, Inc.; is that

3  correct?

4      MR. FIGUEIREDO: Calls for a legal conclusion.

5      Ms. Johnson can answer to the extent of her

6  understanding and knowledge.

7      THE WITNESS: The procedure is after the

8  investment committee approves the investment; then there

9  is, based on that, various legal documents are created.

10 So, yes, the investment was approved. As a member of

11 the investment committee, I participated in it.

12     What were the final documents? That would be

13 up to the VTB's legal department; what format, they

14 chose too. That's why I'm trying to understand your

15 questions.

16 BY MS. MEYER:

17     Q. You don't know what format they chose. You

18 don't know -- is it correct, you don't know if the

19 investment memorandum that you reviewed is, in fact, the

20 contract between VTB Bank and Beau Cameron, Inc.,

21 correct?

22     A. No, that is not correct. I said that I am

23 confident that based on the investment decision made,

24 VTB followed the standard procedure, and they created a

25 standard document just a for every other company.

66

ALEXANDRA JOHNSON  EXHIBIT 1  34

**BARKLEY**
Court Reporters

1  really having a difficult time getting into the mind set

2  of a party that's not a party to this lawsuit.  Please

3  explain that to me.  Or if you persist with these

4  questions, I'm going to shut it down and ask the witness

5  not to answer.

6        You're asking for the mind set of a company

7  that's not a party.  There's confidential, proprietary,

8  trade secret, privacy grounds to object.  Please explain

9  it.  I'll object and instruct my witness not to answer

10  otherwise.

11        MS. MEYER:  So back to this question after I

12  lay the foundation for it.  How about that?

13        MR. FIGUEIREDO:  Please lay the foundation.

14  BY MS. MEYER:

15    Q.  Ms. Johnson, were you on the ZAO board in

16  January of 2010?

17    A.  Yes.

18    Q.  Who else was on the board with you?

19    A.  Different times they have different people.  I

20  can give a list of everybody who at some point was

21  associated with the board.

22    Q.  Who was on the board in January of 2010 to the

23  best of your recollection?

24    A.  2010, that would be Oleg Oleynikov, Beau, Mark

25  Rabinovich.  And then there were two people were added,

79

BARKLEY
Court Reporters

1    A.  Yes.

2    Q.  Did, to your knowledge, VTB ever ask questions

3  about the budgets that were sent to them?

4    A.  As a board members?

5    Q.  Did VTB Bank ever ask the board members

6  questions about the budget?

7    A.  Did VTB Bank -- VTB Bank -- you know, you'll

8  have to be more specific, like who do you have in mind?

9    Q.  I'm just asking if any of the accountants at

10  VTB Bank asked questions about the budgets that were

11  submitted or the expense reports submitted?

12        MR. FIGUEIREDO:  Calls for speculation.

13        To the extent you have personal knowledge, you

14  can answer.

15        THE WITNESS:  Yeah.  They didn't ask me.

16  BY MS. MEYER:

17    Q.  Okay.  Were you aware the board members, that

18  they asked anybody on the board?

19    A.  Yes.

20    Q.  Who did they ask questions of?

21    A.  Zuzin.

22    Q.  Zuzin?

23    A.  Yes.

24    Q.  And do you know what they questioned in

25  particular?

101

ALEXANDRA JOHNSON  EXHIBIT 1
36

BARKLEY
Court Reporters

1      A.  Yes.

2      Q.  And I'm asking what did Beau Cameron, Inc.

3 invest to obtain its shares?

4      A.  Know how.

5      Q.  Okay.  So are you talking about the

6 intellectual property?

7      A.  Yes.

8      Q.  Okay.  Do you recall that a value was assigned

9 to the intellectual property at the time that the

10 investment was made by VTB Bank?

11      MR. FIGUEIREDO:  The witness can answer to the

12 extent she knows whether a value was assigned or not.

13 To the extent you asked -- and I'm going to instruct the

14 witness not to disclose the value.  That is proprietary

15 information.  She can answer as to whether she is aware

16 that a value was assigned.

17      THE WITNESS:  Yes, a value was assigned.

18 BY MS. MEYER:

19      Q.  Okay.  And was that value put in the investment

20 memorandum?

21      A.  There was a range put in the investment

22 memorandum.

23      Q.  Okay.  And do you recall the board ever

24 authorizing to Beau Laboratories to pay Beau Cameron

25 $250,000 for that intellectual property?

ALEXANDRA JOHNSON EXHIBIT 1
37

BARKLEY
Court Reporters

1          MR. FIGUEIREDO: Yeah. Ms. Meyer, that

2     misstates -- misstates prior testimony entirely.

3          MS. MEYER: I didn't ask that question before,

4     so I don't how it could misstate anything prior. I've

5     never asked the gentleman.

6          MR. FIGUEIREDO: That's exactly -- you did not

7     ask that question before, and now you're acting as if

8     you did. You're misstating prior testimony. That is

9     not what the discussion in the past about the legal

10    budget was about at all, Ms. Meyer.

11         MS. MEYER: I didn't say that it was.

12         MR. FIGUEIREDO: You just characterized it as

13    relating to an arbitration. We're now hearing about an

14    arbitration for the first time.

15         MS. MEYER: Legal objection -- thank you.

16    Q.   My question to you is, have you ever seen the

17    arbitration decision in the matter between Anzhey

18    Barantsevich and Beau, LLC?

19    A.   No.

20    Q.   Are you aware that the arbitrator found that

21    Anzhey Barantsevich was entitled to a million-dollar

22    finder's fee for securing the investment from VTB Bank?

23    A.   I am not aware.

24    Q.   Are you aware that Beau Cameron took $250,000

25    of that money for himself?

113

1  Could you read back my last question, please.

2          (Record read.)

3          MS. MEYER:  I'll restate it.

4      Q.  Are you aware that the arbitration decision

5  leaves open the prospect of Beau Laboratories recovering

6  monies that Beau Cameron took from it?

7          MR. RAPKIN:  Objection; irrelevant.  Objection;

8  misstate the arbitration decision.  Objection; assumes

9  facts not in evidence.  Objection; assumes that this

10  witness --

11          MS. MEYER:  Okay.

12          MR. RAPKIN:  Objection; assumes that this

13  witness would understand any legal conclusions issued by

14  an arbitration decision if she had even read it, which

15  she's said five times she hasn't.

16          MR. FIGUEIREDO:  Same objections as before and

17  as Mr. Rabkin.

18          MS. MEYER:  You can answer.

19          THE WITNESS:  I am not aware.

20  BY MS. MEYER:

21      Q.  Okay.  As a ZAO board member, do you ever --

22  were you aware that certain of the monies that were

23  funded per the agreement or the deal between VTB Bank

24  and Beau Cameron, Inc. had to remain in industries in

25  Russia?  I'm sorry.

ALEXANDRA JOHNSON  EXHIBIT 1
39

BARKLEY
Court Reporters

1         MR. FIGUEIREDO:  Objection; vague.

2   BY MS. MEYER:

3       Q.   Was it part of the original deal terms that

4   monies -- part of the monies that were funded had to be

5   spent in Russia?

6       A.   That was not phrased like that.

7       Q.   Okay.  How would you phrase it?

8       A.   That the -- Beau -- ZAO Beau Labs had to have a

9   presence in Russia.

10      Q.   And did a certain amount of monies have to be

11  spent ^hence in presence of Russia?

12      A.   No.  They had to develop some IT there --

13  intellectual property there.  And -- yeah, that's it.

14  That was the requirement.

15      Q.   Okay.  And was there any expectation of how

16  much of those monies would have to be used in Russia

17  versus spent in the United States?

18      A.   I am not aware of that.

19      Q.   Okay.  So you're not aware of there being any

20  requirement of that sort?

21      A.   Yeah.

22         MR. FIGUEIREDO:  Objection; vague as to what

23  sort.

24         THE WITNESS:  Right.

25         MS. MEYER:  A certain amount of money, other

116

1          MR. RAPKIN:  Objection as to time.

2          THE WITNESS:  Yeah, what time?

3          MS. MEYER:  I don't have to give you a time.

4      Q.  Were you aware at any time?

5      A.  Yes.

6      Q.  And when were you first aware of that?

7      A.  You want a timeframe?  I would think -- when

8   was I aware?  That would be winter of 2010.

9      Q.  Was it -- can you define it any more than that?

10  Was it January, February, March just -- December?

11     A.  February probably.

12     Q.  And how did you become aware there was a

13  breakdown in the relationship?

14     A.  There was an urgent plea for money which the --

15  that second trench -- and the -- VTB needed to see the

16  status of the company, the milestones, so Oleg Oleynikov

17  made a call.  And that's when he discovered that there

18  was a dispute, and that's when I learned about it from

19  Oleg.

20     Q.  What did Oleg tell you?

21     A.  That there is an argument between Beau and

22  Anzhey.

23     Q.  Did he tell you what it was about?

24     A.  She said they argued about everything.

25     Q.  And at that point in time, did the board

118

ALEXANDRA JOHNSON   EXHIBIT 1
41

BARKLEY
Court Reporters

1          MR. FIGUEIREDO:  Yes.

2          THE WITNESS:  That he was not sure what

3    happened in reality.

4    BY MS. MEYER:

5        Q.  Okay.  Did you ever learn any more information

6    after that conversation with Oleg about their dispute?

7        A.  After that, a new person came into VTB venture

8    department, and that person took over the process; so I

9    didn't have to follow the details.

10       Q.  Were you removed from some position at VTB?

11       A.  No.

12       Q.  You said a new person came in and took over the

13   process, who was that person?

14       A.  Well, his name is Idar Kaliev -- K-A-L-I-E-V.

15       Q.  Okay.  Did Idar -- when you say he took over

16   the process, what process are you talking about?

17       A.  Finding out what happened with Beau Labs -- ZAO

18   Beau Labs.

19       Q.  Okay.  And do you know when Idar Kaliev took on

20   that role?

21       A.  Yeah, that was that same winter.

22       Q.  Okay.

23       A.  And I needed to go home, and I happily gave it

24   to him.  So I left -- I left Moscow, and that's what I

25   mean by taking over.  I had to return home.

ALEXANDRA JOHNSON  EXHIBIT 1
42

BARKLEY
Court Reporters

1        THE WITNESS:  No, I have not talked about those

2    companies.

3    BY MS. MEYER:

4        Q.  Did Oleg Oleynikov ever tell you that Anzhey

5    had wired funds to companies that are offshore companies

6    when he should not have?

7        A.  Oleg did talk about some allegations that

8    something -- that something like that did happen, but I

9    don't recollect the specific formulation as to what

10   exactly happened.

11       Q.  Well, what do you recall Oleg saying?

12       A.  That funds were misappropriated.

13       Q.  That's all he said, "funds were

14   misappropriated"?

15       A.  Well, there probably was more, but -- because

16   it was going back and forth, and it was a never-ending

17   situation.  And at some point I just -- yeah.  No, I

18   don't remember.

19       Q.  Do you know if VTB Bank did any internal

20   investigation to find out if funds were misappropriated?

21       A.  It's ongoing.

22       Q.  So they're investigating it now?

23       A.  They are continuing to investigate the

24   situation with the company, and still -- still trying to

25   understand what -- what's happening there, so it's

159

ALEXANDRA JOHNSON    EXHIBIT 1
                         43

BARKLEY
Court Reporters

1  ongoing.

2      Q.  And who is conducting that investigation?

3      A.  VTB's venture department.

4      Q.  And who is heading that up?

5      A.  Mr. Kaliev -- Idar Kaliev.

6      Q.  Has anybody at VTB been questioned about their

7  receiving kickbacks?

8          MR. FIGUEIREDO:  Objection; calls for

9  speculation.

10         THE WITNESS:  I do not know.

11  BY MS. MEYER:

12     Q.  What about the gentleman I referred to earlier,

13  Mr. A-Z-A-M-I-R-Z-Y-A-N, do you know if he received any

14  of the monies that were purportedly wired by Anzhey that

15  Oleg is referring to?

16     A.  I have no idea what you're talking about.

17     Q.  So is that a no?

18     A.  I am not aware.  I do not know.

19     Q.  Did you, yourself, receive any monies of

20  kickbacks?

21     A.  I have not.

22     Q.  Do you know if there is any investigation of

23  whether you've received any monies?

24     A.  No.

25     Q.  Do you know what -- what -- you said Idar

160

1          MR. FIGUEIREDO:  Which is did you receive this

2  document?

3          MS. MEYER:  Are you still there?

4          THE WITNESS:  Yeah.  I'm trying to read the

5  document.

6          (Witness examining document.)

7          I have received that document.

8  BY MS. MEYER:

9    Q.  And did you understand that document to be from

10  Mark Rabinovich?

11    A.  No.

12    Q.  Who did you understand the document to be from?

13    A.  You know, I'm trying to remember because it was

14  like a year ago.  That it was probably sent in a bunch

15  of documents, for the board meeting, from my secretary

16  from VTB venture department; so I assume it came from

17  them.

18    Q.  Was the secretary at the venture department the

19  one who sent out all the documents for the board

20  meetings?

21    A.  Usually, yeah.

22    Q.  And would that include the budgets as well?

23    A.  Yeah.

24    Q.  Who was that person?

25    A.  All different people at different times.

ALEXANDRA JOHNSON  EXHIBIT 1
45

BARKLEY
Court Reporters

1       Q.  Who was it in 2008?

2       A.  Oh, that I cannot tell you.  You know, that --

3   that person left VTB, and I forgot her name.  I can tell

4   who it is now.

5       Q.  Okay.

6       A.  The secretary is from the protocol office, is

7   Svetlana Zaitseva -- I'll do the last name

8   Z-A-I-T-S-E-V-A -- and sometimes it comes from

9   Oleynikov.

10      Q.  And that's where you believe you received this

11  document?

12      A.  Probably.  I don't remember.

13      Q.  Do you recall discussing this document at a

14  board meeting?

15      A.  You know, I'm -- I have to think about it.

16  Because there were two documents looking like this, and

17  I don't know which one this one is.

18      Q.  Do you recall being at the board meeting that

19  Mark Rabinovich felt that his -- the minutes of a board

20  meeting misrepresented his vote on the board?

21      A.  No.  I don't remember discussing that, no.

22      Q.  You don't recall that occurring?

23      A.  I do not remember.

24      Q.  Is it that it could have occurred and you may

25  not remember it, or you're sure it did not occur?

ALEXANDRA JOHNSON  EXHIBIT 1
46

BARKLEY
Court Reporters